UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CURT HEPP,

    Plaintiff,

v.

ULTRA GREEN ENERGY SERVICES LLC;
CPS FINANCIAL, INC.; KATHY PASKVAN;
WILLIAM PASKVAN; AND JONATHAN
PAYNE,

    Defendants.

No. 16 C 8440

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Curt Hepp alleges that Defendants fraudulently transferred funds from Ultra Green Energy Services LLC to prevent him from collecting on a guarantee Ultra Green had executed in Hepp's favor. R. 1. Defendants CPS Financial, Kathy Paskvan, Bill Paskvan, and Jonathan Payne, have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. R. 15. For the following reasons, that motion is denied.

**Legal Standard**

"The plaintiff bears the burden of establishing personal jurisdiction when the defendant challenges it." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). On a motion challenging personal jurisdiction, the Court may "receive and weigh" affidavits and other evidence outside the pleadings. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the

Court does not hold an evidentiary hearing to resolve factual disputes, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *N. Grain*, 743 F.3d at 491. On a motion pursuant to Rule 12(b)(2), the Court will "resolve factual disputes in the plaintiff's favor." *Id.* The Court, however, also "accept[s] as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff." *GCIU-Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

**Background**

Hepp, a resident of Texas, made a loan to M1 Energy Risk Management, LLC, and M1 executed a promissory note in favor of Hepp. R. 1 ¶¶ 1, 4. Ultra Green guaranteed the note. *Id.* ¶ 1. M1 defaulted on the loan, and Hepp demanded payment on the guarantee from Ultra Green in early 2013, but Ultra Green refused to pay. *Id.* ¶¶ 1, 17. Hepp brought an action to enforce the guarantee against Ultra Green in this Court on June 27, 2013. *See* 13 C 4692 (N.D. Ill.). On September 30, 2015, Hepp won a judgment against Ultra Green in the amount of $402,199. R. 1 ¶ 2.

Ultra Green is a Delaware LLC that originally had its principal place of business in Illinois. *Id.* ¶ 5. At the time of its formation, Ultra Green had three members—defendants CPS Financial, and Jay and Cathy Pierce. *Id.* ¶¶ 12-13; R. 15-1 at 8. CPS—which is solely owned by defendant Kathy Paskvan—held an 80% interest in Ultra Green, and Jay and Cathy Pierce each held a 10% interest. *Id.* ¶¶ 12-13; R. 15-1 at 8. The Pierces also managed Ultra Green's operations and

finances, *id*. ¶ 13, including its bank accounts and files which, according to Kathy Paskvan, were located in Illinois. *See* R. 15-1 ¶¶ 20-25. Ultra Green began to wind down its business in October or November 2012, and was no longer doing business by the end of 2012. R. 1 ¶ 14.

By a purchase agreement effective April 25, 2013, CPS purchased the Pierces' interest in Ultra Green. *Id*. ¶¶ 18-19. The purchase agreement and the related promissory note provided for jurisdiction and venue in Cook County, Illinois in the event of a dispute. *Id*. ¶ 19. After the purchase, defendant Jonathan Payne—an Ultra Green employee and minority shareholder, and Michigan resident—became a managing member of Ultra Green. *Id*. ¶ 9, 23. Kathy Paskvan states in a sworn affidavit that Ultra Green was immediately relocated to Georgia upon CPS's purchase from the Pierces. R. 15-1 ¶ 21. This relocation was accomplished by closing Ultra Green's bank account in Illinois, opening an account for Ultra Green in Georgia, and sending Ultra Green's files from Illinois to Georgia. *Id*. ¶¶ 21-25. In her affidavit, Kathy Paskvan states that all these events occurred immediately upon the CPS's purchase of the Pierces' interests in Ultra Green, but she also states that Ultra Green's bank account in Illinois was open until at least May 13, 2013, when Cathy Pierce mailed a check from Ultra Green's Illinois bank account to Kathy Paskan. R. 15-1 ¶ 25; R. 16-2 at 2-3. Ultra Green also was not registered as a Georgia limited liability company until July, 11, 2013, and it remained registered as an Illinois limited liability company until July 11, 2014. R. 15-1 ¶ 24; R. 16-5 at 2.

Hepp alleges that between May 2013 and August 2015, Ultra Green transferred $505,518.36 to CPS and Kathy Paskvan. R. 1 ¶ 27. Hepp also alleges that Payne received $187,500 from Ultra Green between May 2013 and April 2014. *Id.* ¶ 29. During the trial of Hepp's claims against Ultra Green, Kathy Paskvan testified that she also received payments from Ultra Green prior to April 2013. R. 16-2 at 5. Hepp alleges that CPS, Kathy Paskvan, and Payne did no "real work" in consideration for these payments. *Id.* ¶¶ 25, 27, 30.

Ultra Green received a payment of $1,966,437.08 from the federal government on September 27, 2013, *id.* ¶ 32, but as of December 31, 2014, Ultra Green had only $471,216 in its bank accounts. *Id.* ¶ 35. As of August 31, 2015, Ultra Green's funds were down to $103.54. *Id.* ¶ 37.

Hepp alleges that Bill Paskvan controls both CPS and Ultra Green, because his wife Kathy Paskvan knows "little or nothing about the business, and her role [is] that of a nominal owner in name only." R. 1 ¶¶ 12, 18. According to Hepp "any actions taken by Kathy Paskvan were done on behalf of, and at the direction of, Bill Paskvan." *Id.* ¶¶ 23-24. By affidavit in this case, Bill Paskvan admits that Jay Pierce frequently called him "to report on the status of [UItra Green's] business operations." R. 15-2 ¶ 11. He also admits that "[b]eginning on or after April 25, 2013, [he] advised [Ultra Green] in the liquidation of [its] assets." *Id.* ¶ 12. At the trial of Hepp's claims against Ultra Green, Kathy Paskvan testified that Bill Paskvan "kept in touch with Jay Pierce" regarding UItra Green's business, and "[t]hat was all between my husband and Mr. Pierce." R. 16-4 at 5. She testified that

4

with respect to Ultra Green's affairs, "my husband acted as my representative," and "my husband took care of the affairs with [Ultra Green] on my behalf." *Id.* at 5. Kathy Paskvan also testified that she did not know whether Ultra Green made a profit between 2007 and 2013 because the "financial statements went to my husband." *Id.* at 6. She also testified that she did not understand Ultra Green's business, "[s]o my husband took care of this for me." *Id.* at 9.

**Analysis**

"A federal court sitting in diversity," as is the case here, "must rely on the law of personal jurisdiction that governs the courts of general jurisdiction in the state where the court is sitting." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Illinois law permits its courts to exercise jurisdiction over a person to the extent permitted by the Constitution. *See N. Grain*, 743 F.3d at 491 (citing 735 ILCS 5/2-209(c)). The Supreme Court has held that under the Due Process Clause of the Fourteenth Amendment a "forum state's courts may not exercise personal jurisdiction over a nonconsenting, out-of-state defendant unless the defendant has 'certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* at 492 (quoting *Int'l Shoe Co. v. State of Washington, Office of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945)). "If the defendant has 'continuous and systematic' contacts with a state, the defendant is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts." *N. Grain*, 743 F.3d at 492 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). "To

5

support an exercise of specific personal jurisdiction, the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction." *N. Grain*, 743 F.3d at 492; *see also Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."). By contrast, "[s]pecific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain*, 743 F.3d at 492 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain*, 743 F.3d at 492. In general, "[t]he defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *Id.* (citing *Burger King*, 471 U.S. at 474).

**I.    General Jurisdiction**

Hepp argues that Defendants have "continuous and systematic general business contacts" with Illinois because "Defendants' control over Ultra Green is so complete that to the extent the Court has jurisdiction over Ultra Green, the Court also has jurisdiction over Defendants because they are alter egos of Ultra Green." R. 16 at 7.

6

Although Hepp uses the term "alter ego" to described the relationship between Defendants and Ultra Green, piercing Ultra Green's corporate veil is not the only way for the Court to exercise jurisdiction over Defendants based on Ultra Green's contacts with Illinois. *See Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 456 N.E.2d 217, 222 (Ill. 1984); *Zimmerman v. JWCF, LP*, 2011 WL 4501412, at *6 (N.D. Ill. Sept. 28, 2011). Illinois courts can exercise jurisdiction over parent entities based on the activities of their subsidiaries when "the parent . . . exercise[s] an unusually high degree of control over the subsidiary." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). Such an exercise of jurisdiction is proper where "a subsidiary corporation is acting as the parent corporation's Illinois agent in the sense of conducting the parent's business rather than its own." *Alderson v. Southern Co.*, 747 N.E.2d 926, 944 (Ill. App. Ct. 2001); *see also Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 456 N.E.2d at 222 ("In the case at bar, we believe that [the parent] had sufficient contacts with Illinois to invoke the jurisdiction of Illinois courts. The record demonstrates that [the subsidiary] was . . . wholly owned [by the parent], and that [the subsidiary] operated in Rosemont, Illinois, as a supply depot for [the parent's] products for the entire United States. Clearly [the parent], through [the subsidiary], was doing business in Illinois."). The critical question is whether the Illinois subsidiary exists for no purpose other than conducting the business of its parent. *Alderson*, 747 N.E.2d at 944.

It is undisputed that Ultra Green was doing business in Illinois such that its is subject to the Court's general jurisdiction. But until CPS bought the Pierces' interests in Ultra Green, none of the defendants can be said to have had an "unusually high degree of control" over Ultra Green's business. Rather, Defendants bought the Pierces interests in order to acquire control of the company. It was not until that purchase was complete that Ultra's Green's contacts with Illinois could be imputed to Defendants, meaning that all of Ultra Green's prior contacts are not relevant to this analysis. Because Defendants are not alleged to have acquired control over Ultra Green to such an extent until CPS's purchase agreement with the Pierces, the Court cannot exercise jurisdiction over Defendants based on Ultra Green's contacts with Illinois.

## II. Specific Jurisdiction

Whether specific jurisdiction exists must be analyzed separately with respect to each individual defendant. The Court will address each defendant in turn.

### A. Minimum Contacts

#### 1. CPS Financial

CPS argues that the Court does not have jurisdiction over it because its only contact with Illinois is its ownership interest in Ultra Green, and "constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone." *Cent. States*, 230 F.3d at 943. But, the Seventh Circuit continued, this is only true "where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over

8

the subsidiary." *Id.* CPS's decision to purchase a controlling interest in Ultra Green took its contacts with Illinois out of the realm of mere "corporate affiliation or stock ownership" and thrust it into direct control of an Illinois asset. This is a basis for personal jurisdiction under Illinois law. *See* 735 ILCS 5/2-209(a)(10) (jurisdiction exists over a person who engages in "acquisition of ownership, possession or control of any asset or thing of value present within [Illinois] when ownership, possession or control was acquired.").

Furthermore, CPS then exercised its ownership interest to remove Ultra Green from Illinois. CPS caused Ultra Green to close its Illinois bank account and to ship its business records out of Illinois. CPS argues that Ultra Green was no longer based in Illinois "immediately" upon CPS's acquisition. But this contention is belied by Kathy Paskan's statements that (1) Ultra Green maintained a bank account in Illinois for at least a month beyond CPS's acquisition, and (2) Ultra Green was not registered as a Georgia limited liability company until July 2013, more than two months after CPS acquired it. Additionally, Ultra Green maintained its registration as an Illinois limited liability company until July 2014. All these contacts demonstrate that CPS purposefully directed its activity towards Illinois in order to acquire Ultra Green and then move it out of Illinois. Notably, CPS is alleged to have taken these actions to make Ultra Green's funds unavailable to satisfy (1) a guarantee executed in Illinois, and (2) a judgment enforcing that guarantee rendered by a court sitting in Illinois.

Additionally, Hepp's alleged injuries arose out of CPS's ownership interest in Ultra Green and CPS's decision to begin removing funds from Ultra Green while it was still based in Illinois. Immediately after CPS acquired a controlling stake in Ultra Green, CPS began to take funds from Ultra Green. Hepp alleges that these transfers began to occur on May 24, 2013, little more than a week after Ultra Green transferred the funds remaining in its Illinois bank account to its Georgia bank account, and more than a year before Ultra Green's registration as an Illinois limited liability company expired. Hepp claims that CPS sought to control Ultra Green in part to prevent him from being able to collect on the guarantee Ultra Green had executed in Hepp's favor. This claim is plausible in light of Hepp's additional allegations that Ultra Green was longer conducting business, yet more than $1 million passed out of its accounts in the two years after CPS acquired a controlling interest. A number of state and federal courts in Illinois have exercised personal jurisdiction in similar circumstances. See *In re Marriage of Difiglio*, 2016 WL 6137196, at *3 (Ill. App. Ct. 3d Dist. Oct. 19, 2016) ("Because Malmstedt acquired possession and control of the assets in Illinois, and Stanislawa's cause of action against Malmstedt arose from his possession and control of those funds, the trial court had jurisdiction over Malmstedt, pursuant to section 2–209(a)(10) of the Illinois long-arm statute."); *Sirazi v. Gen. Mediterranean Holding, SA*, 2013 WL 812271, at *5 (N.D. Ill. Mar. 5, 2013) ("Plaintifs have alleged that the transfer of Rezco's ownership interests to Orifarm was made with the intent to prevent Plaintifs from asserting their security interest in Heritage. The facts as alleged by

10

Plaintiffs satisfy the 'express aiming' requirement . . . ."); *Woolard v. Woolard*, 2009 WL 3150435, at *6 (N.D. Ill. Sept. 23, 2009) ("Plaintiff has put forth evidence showing that Defendant transferred assets to his wife while she was an Illinois resident, including the proceeds from the sale of his Illinois home . . . . These facts show that [the wife] acquired 'ownership, possession or control of ... asset[s] or thing[s] of value [that were] present within [Illinois]' at the time of acquisition." (citing 735 ILCS 5/2–209(a)(10))); *MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*, 2012 WL 6021547, at *7 (N.D. Ill. Nov. 30, 2012) ("The facts as alleged by MacNeil satisfy the 'express aiming' requirement, because the transfer was made with the knowledge that it would prevent Cannon from satisfying its obligations to MacNeil."); *see also First Horizon Bank v. Moriarty-Gentile*, 2016 WL 6581199, at *3 (E.D.N.Y. Nov. 3, 2016) ("the district court located the situs of injury in New York because the fraudulent conveyances impeded Petitioner's ability to enforce its New York judgment" (citing *Universitas Educ., LLC v. Nova Grp., Inc.*, 2014 WL 3883371, at *1 (S.D.N.Y. Aug. 7, 2014))). Thus, Hepp's alleged injuries arose out of CPS's contacts with Illinois, such that the Court has personal jurisdiction over CPS.

2. **Kathy Paskvan**

Kathy Paskvan cites the Seventh Circuit's decision in *Central States* (noted above) to argue that "the Illinois contacts of CPS . . . cannot be imputed to [her] in her individual capacity." R. 15 at 9. But as discussed, this is not true if she "exercise[s] an unusually high degree of control over" CPS. *Central States*, 230 F.3d at 943. And that is precisely what Hepp alleges. Hepp alleges that Kathy Paskvan

is the sole shareholder of CPS. He also alleges that Kathy Paskvan "controls" CPS. Additionally, Kathy Paskvan's statements in her affidavit paint a picture of CPS acting as her agent for conducting business in Illinois. All of CPS's activities in Illinois were undertaken at her behest. And there is no indication in the record as it currently stands that the CPS has any other purpose than to advance Kathy Paskvan's interests. Hepp's allegations taken together with Kathy Paskvan's description of her relationship with CPS are a sufficient basis to state a prima facie case of jurisdiction over Kathy Paskvan.

### 3. Bill Paskvan

Hepp alleges that Kathy Paskvan is a mere figurehead, and that Bill Paskvan makes the business decisions regarding CPS and Ultra Green. In other words, Hepp alleges that Kathy Paskvan is Bill Paskvan's agent. An agency relationship is sufficient to confer personal jurisdiction. *See* 735 ILCS 5/2-209(a) ("Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State . . . ."); *see also Capgain Properties Inc. v. Landmaster Partners, LLC*, 2016 WL 3035534, at *2 (N.D. Ill. May 29, 2016) ("Personal jurisdiction over an entity is appropriate when minimum contacts are established through an agent of the entity."); *Avesta Sheffield, Inc. v. Olympic Cont'l Res., L.L.C.*, 2000 WL 198462, at *4 (N.D. Ill. Feb. 14, 2000) ("Establishing personal jurisdiction over a defendant through an agent is also consistent with the due

12

process clause."). Kathy Paskvan has admitted that she did not make the decisions with respect to CPS's business, but instead followed Bill Paskvan's instructions. And Bill Paskvan has similarly testified that he is the person running the show. The Court finds that Hepp has sufficiently alleged that Kathy Paskvan is Bill Paskvan's agent with respect to CPS's contacts with Illinois for the Court to exercise jurisdiction over Bill Paskvan.

### 4. Jonathan Payne

Payne was a managing member of Ultra Green when it began transferring funds to CPS and it was moved out of Illinois. Although Payne only held a small minority interest in Ultra Green, whereas CPS purchased and held a large controlling interest, Payne was nonetheless a custodian of property in Illinois, and transferred it out of Illinois for allegedly fraudulent reasons. As discussed with respect to CPS, these are sufficient contacts with Illinois for the Court to maintain jurisdiction over Payne.[1]

### B. Fair Play and Substantial Justice

Defendants only argue that they do not have sufficient contacts with Illinois to establish jurisdiction, and they do not address whether the Court's exercise of jurisdiction would "comport with traditional notions of fair play and substantial

---

[1] Contrary to his argument, the allegations and facts in the record do not demonstrate that Payne is immunized by the fiduciary shield doctrine, because that "doctrine is inapplicable to proprietors, partners, or comanaging members of a limited liability corporation." *Khan v. Gramercy Advisors, LLC*, 61 N.E.3d 107, 124 (Ill. App. Ct. 4th Dist. 2016); *see also Plastic Film Corp. of Am. v. Unipac, Inc.*, 128 F. Supp. 2d 1143, 1147 (N.D. Ill. 2001) ("the fiduciary shield does not apply to high-ranking corporate officers and directors").

justice." Since Defendants do not raise that issue, the Court will not address it. But the Court notes that it does not perceive any deficiency in this regard.

### III. Forum Non Conviens

Defendants argue that Georgia is the better forum for this case and seek dismissal under the doctrine of forum non conviens. This Court has already heard testimony and considered documentary evidence relevant to Hepp's claims in the course of Hepp's case against Ultra Green for payment on the guarantee. For that reason, to the extent the Court has jurisdiction over the defendants, it makes little sense to dismiss this case in favor of another federal district.

## Conclusion

For the foregoing reasons, Defendants' motion is denied without prejudice to re-raising issues of Kathy and Bill Paskvan's control over CPS should discovery reveal facts that are contrary to the Court's decision in this opinion and order.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 21, 2016